UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARTIN ARMANDO
VALENZUELA STIRK,

      Petitioner,

v.                                      CASE NO. 8:20-cv-2894-SDM-AAS

JESSICA LIZBETH
CRUZ LOPEZ,

      Respondent.

_____/

## ORDER

Martin Valenzuela petitions (Doc. 1) under the Hague Convention to return M.V.C., his five-year-old daughter, to Mexico.  Valenzuela alleges that Jessica Cruz, M.V.C.'s mother, wrongfully removed M.V.C. in January 2020 from Mexico to Plant City, Florida.  (Doc. 1 at 1-11)  A December 6, 2020 order (Doc. 6) enjoined Cruz from removing M.V.C. from the Middle District of Florida, Tampa Division, during the pendency of this action.  After a two-day evidentiary hearing, a December 17, 2020 order (Doc. 20) under Article 15, Hague Convention, recessed the hearing to request from the Mexican Central Authority a determination under Article 3 of the lawfulness of M.V.C.'s removal.

Valenzuela submits (Doc. 53-1) an Article 15 letter from the Mexican Central Authority.  Also, Cruz has begun in Chihuahua, Mexico, an action to change M.V.C.'s residence and to eliminate Valenzuela's "coexistence rights" (visitation)

with M.V.C.  (Doc. 27)  Although Cruz's Mexican action remains pending, the Hague Convention counsels an expeditious resolution of Valenzuela's petition. *Chafin v. Chafin*, 742 F.3d 934, 936 (11th Cir. 2013) ("[C]ourts [should] take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation."); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1015 (9th Cir. 2009) (noting that the pendency of an underlying custody action should not affect the resolution of a Hague petition).  Cruz and Valenzuela have offered supplemental papers (Docs. 27, 30–34) and briefs (Docs. 26, 36).[1]

## FINDINGS OF FACT

Valenzuela, a Mexican citizen, lives in Juarez, Chihuahua, where he owns a home.  Except while intermittently working in the United States, Valenzuela works at the social security administration in Juarez.  Since her most recent departure from Mexico, Cruz, also a Mexican citizen, has lived in Plant City, Florida, where she and her new husband work for her parents.  She resides in Plant City with her husband, Carlos Licon, and with her three children, including M.V.C. Valenzuela is the biological father of M.V.C., who is five and an American citizen (perforce her birth in the United States).

---

[1] The December 20, 2020 order (Doc. 20) warns the parties that the grant of leave to submit supplemental papers "is not a determination that the papers are pertinent to any issue, is not an agreement to resolve any issue, and does not relieve Cruz of the burden to litigate in Mexico any issue. . ." Most of the parties' papers are irrelevant, founded on hearsay, or both. This order addresses the papers pertinent to resolving the petition.

In 2012, Valenzuela began living in Juarez with Cruz.  After acquiring a visa to work for Cruz's parents in Plant City, Valenzuela in 2014 moved with Cruz to Plant City.  Intending only a temporary move, Valenzuela and Cruz left furniture in Mexico and never bought property in Florida.  M.V.C. was born in 2015 while Valenzuela and Cruz lived in Florida.  (Doc. 18-1)  Less than a year after M.V.C.'s birth, Valenzuela, Cruz, and M.V.C. moved back to Juarez.  Valenzuela and Cruz transferred all of M.V.C.'s records, including medical records, to Juarez and moved into a house owned by Cruz's parents.  Planning to raise M.V.C. in Mexico, Valenzuela and Cruz secured for M.V.C. healthcare, childcare, and education — all in Juarez.

In 2017 in Juarez, Valenzuela married Cruz.  (Doc. 18-2)  But three months later, Valenzuela and Cruz separated after a fight.  The fight occurred after an evening of drinking with a group at a bar with her children present and during the drive home with her children in the back seat.  Valenzuela and Cruz argued about money (apparently Valenzuela paid the group's tab at the bar).  Valenzuela and Cruz, each admittedly inebriated, hit one another.  After several minutes fighting and driving under the influence of alcohol and with the children in the car, Valenzuela stopped the car.  Cruz demanded that Valenzuela leave her children and her by the side of the road.  After she and the children left the car, Cruz called members of the group at the bar, who were still at the bar and who were still drinking, for a ride home.  Eventually, Cruz sought treatment for her injuries, including bruising to her

eye and bruising to her head.  (Doc. 31 at 35)  Although Cruz filed a police report

(Doc. 31 at 36–40), the police apparently neither investigated Valenzuela nor

officially charged Valenzuela for his role in the fight.  Following the fight,

Valenzuela and Cruz maintained close contact.

      After living apart following the fight, Valenzuela and Cruz in 2018 dissolved

their marriage.  Their dissolution agreement includes no acknowledgement of, no

recognition of, and no accommodation for, a threat either to Cruz or to M.V.C. from

Valenzuela, from his family, or even from circumstances in Juarez.  Instead, the

dissolution agreement establishes Valenzuela's "right of coexistence" with M.V.C. in

Juarez:

> In regards to the rights of coexistence of MR. MARTIN
> ARMANDO VALENZUELA STIRK over the minor
> [M.V.C.] they will be carried out as follows: The weekends
> every fifteen days he will pick her up at the address located [in
> Juarez] on Friday afternoon . . . Summer vacation [with]
> JESSICA LIZEBETH CRUZ LOPEZ [and] the next one to
> MARTIN ARMANDO VALENZUELA STIRK. Christmas
> vacation and New Year's under MARTIN ARMANDO
> VALENZUELA STIRK and the next year will alternate with
> JESSICA LIZBETH CRUZ LOPEZ.

(Doc. 18-5 at 21–22)  In accord with the dissolution agreement, Valenzuela assumed

custody of M.V.C. on alternate weekends.  Despite the dissolution agreement's

limiting Valenzuela's visits with M.V.C., Cruz allowed Valenzuela to visit M.V.C.

more often.  For example, Valenzuela regularly would retrieve M.V.C. from school.

M.V.C. enjoyed a close relation with Valenzuela's extended family, whom M.V.C.

regularly visited in Juarez before her removal from Mexico.  After dissolution of the

marriage, Valenzuela has financially supported M.V.C. and has complied with the dissolution agreement.

Cruz alleges (without direct, corroborating evidence) that in January 2020 she received telephone calls from unknown persons threating to abduct M.V.C. Also, Cruz alleges that a black car followed her once. Claiming that unknown persons threatened to abduct M.V.C. and to extort money from Cruz's parents, Cruz removed M.V.C. from the school she regularly attended (Doc. 18-3) and suddenly and unilaterally moved M.V.C. from Juarez to Plant City, Florida. Cruz never notified the police in Juarez about the alleged threats. Valenzuela protested M.V.C.'s removal, which Cruz had concealed from Valenzuela until after Cruz left Mexico with M.V.C. Cruz's testimony about these threats is unconvincing and certainly not clear and convincing.

Cruz claims that for three reasons M.V.C. can neither reside in Juarez nor visit Valenzuela in Juarez. (Doc. 26 at 14–16) First, Cruz claims that M.V.C. faces a nebulous threat of abduction and a threat of violence in Juarez. Cruz's father, Hector Cruz Martinez, who often travels to Juarez and who owns a home in Juarez, testifies that more than eight years ago his son was injured by a gunshot and extorted in Juarez. Also, Cruz attempts to rely on news articles (which were excluded) reporting violence in Juarez. (Docs. 30-10, 30-11, 30-12, 30-16) However, State

Department travel advisories warn travelers to "exercise increased caution in Mexico due to crime and kidnapping."  (Docs. 19, 30-14, 30-15)[2]

Second, Cruz claims that Valenzuela's father (M.V.C.'s paternal grandfather) poses a danger to M.V.C.  Specifically, Valenzuela's father, a police officer, was accused (but never convicted) more than ten years ago of participating in an abduction scheme.  Cruz attempts to rely on reports (which were excluded) detailing an alleged abduction, which occurred more than ten years ago and which targeted neither M.V.C. (unborn at the time) nor any family member.  (Docs. 30-4, 30-5, 30-6, 30-7, 30-9, 30-10, 30-11, 30-12)  Cruz implies without much support that Valenzuela and Valenzuela's family have long evaded the law and have participated in several "extortion scheme[s]" throughout Juarez.  (Doc. 26 at 14–16)  Cruz concludes — the result of a series of weak and compounded inferences — that the accusations against Valenzuela's father evidence danger to M.V.C. in Juarez.  The claim is unconvincing.

Third, Cruz insists that Valenzuela poses a direct threat to M.V.C.  Although admitting that Valenzuela has never abused M.V.C., Cruz sees her fight with Valenzuela as evidence of Valenzuela's dangerously violent temperament. (Doc. 27 at 14)  Further, Cruz says her children fear Valenzuela.  In her 2021 action in Mexico — begun in response to an order in this action — to eliminate

---

[2] Inadvertently excluded earlier (because not identified distinctly by counsel), these State Department's documents are **ADMITTED**.

Valenzuela's "right of coexistence" with M.V.C., Cruz alleges a "real and current threat" to M.V.C. (Docs. 31, 32) Also, Cruz petitions in the Mexican action for "provisional relief" to allow M.V.C. to reside in Florida during the pendency of the Mexican action. (Doc. 31 at 30–32; Doc. 45 at 4) On February 26, 2021, a Mexican judge denied Cruz's petition for "provisional relief." (Doc. 49-1) Based largely on compounded and strained influences and a single incident during which both Valenzuela and Cruz were drunk and reckless, Cruz's claim of a continuing threat from Valenzuela is unconvincing in the present record.

In accord with the December 17, 2020 order (Doc. 20), Valenzuela submits (Doc. 53-1) a letter, issued under Section 15 of the Hague Convention, from the Mexican Central Authority that interprets the dissolution agreement as preserving under Mexican law Valenzuela's "*patria potestad"* (parental rights), "which can only be modified, suspended or limited by judicial determination." Specifically, the Mexican Central Authority determines that the dissolution agreement validly grants Valenzuela "access rights" in Mexico to M.V.C. Because the dissolution agreement includes among the agreed recitals that M.V.C. would reside in Mexico, the Mexican Central Authority finds that "a unilateral decision to remove from or retain [M.V.C.] outside the habitual place of residence might be a breach of the rights of the other parent." In conclusion, the Mexican Central Authority declares that "removal or retention would be considered wrongful in terms of Article 3 of the Hague Convention." (Doc. 53-1 at 1–2)

**CONCLUSIONS OF LAW**

Ratified by many nations, including the United States and Mexico, the Hague Convention on the Civil Aspects of International Child Abduction, as implemented by the International Child Abduction Remedies Act, aims to "secure the prompt return of children wrongfully removed to or retained in any [signatory] state." October 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89.  The Hague Convention ensures that in almost every circumstance, a custody dispute will begin in, and remain for resolution in, the country of the child's "habitual residence."  *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008).

To secure M.V.C.'s return to Mexico, Valenzuela must show by a preponderance of evidence that M.V.C. is "wrongfully removed" from M.V.C.'s "habitual residence."  22 U.S.C. § 9003.  Even if Valenzuela proves that Cruz "wrongfully removed" M.V.C., Cruz can prevent M.V.C.'s return only by establishing a statutorily specified affirmative defense.  *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020).

Opposing M.V.C.'s return to Mexico, Cruz argues that Mexican law allows a parent to violate "coexistence rights" if exercising "*patria potestad*" would expose a child to danger.  Based on her claim of a threatened abduction in Juarez, Cruz argues that M.V.C.'s removal cannot qualify as "wrongful."  (Doc. 26 at 16)  Citing Article 13(b), Hague Convention, Cruz argues that even if M.V.C. was wrongfully removed from Mexico, M.V.C. cannot return to Mexico because "there is a grave risk that her

return would expose [M.V.C.] to physical or psychological harm or otherwise place [M.V.C.] in an intolerable situation." (Doc. 26)

### I.     Wrongful Removal

To establish "wrongful[ ] removal," Valenzuela must prove by a preponderance of the evidence (1) that M.V.C. "habitual[ly] resided" in Mexico immediately before her removal to the United States, (2) that M.V.C.'s removal violates Valenzuela's "custody rights" under Mexican law, and (3) that Valenzuela was exercising these "custody rights" at the time of M.V.C.'s removal. *Berenguela-Alvarado*, 950 F.3d at 1358.

### 1. "Habitual Residence"

"A child's habitual residence depends on the particular circumstances of each case." *Monasky v. Taglieri*, 140 S. Ct. 719, 727 (2020). Although depending on a "totality of circumstances," a child's habitual residence often lies in "the family and social environment in which [the child's] life has developed." *Monasky*, 140 at 726. "Common sense suggests that . . . [if] a child has lived in one place with family indefinitely, that place is likely [the] 'habitual residence.'" *Monasky*, 140 at 726. And absent a shared parental intent to move a young child," a claim that "an earlier habitual residence has been abandoned" warrants great skepticism. *Ruiz v. Tenorio*, 392 F.3d 1247, 1255 (11th Cir. 2004). A change in a child's "habitual residence" to another country is unlikely "unless objective facts point unequivocally to a change" in the child's "relative attachments to the two countries" such that returning the child

to the original country "would now be tantamount to changing the child's family and social environment." *Chafin v. Chafin*, 742 F.3d 934, 939 (11th Cir. 2013).  Further, a child's family and social environment is unlikely to change if less than a year elapses between removal and a return petition.  Article 12, Convention on the Civil Aspects of International Child Abduction (Hague Convention), T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11 (imploring "the return of the child forthwith" if less than a year elapses between removal and a petition).

Although M.V.C. was born in Florida, Valenzuela and Cruz raised M.V.C. in Juarez and established Juarez as M.V.C.'s permanent home.  Besides living in Florida for less than a year after birth, M.V.C. has lived her entire life in Mexico. M.V.C. attended school in Juarez, enjoyed a close relationship with family in Mexico, and participated in the usual social activity in Juarez.  Because less than a year elapsed before Valenzuela's petition and because the parties admit that no objective facts "point unequivocally" to a permanent change in M.V.C.'s social attachment to Mexico, Juarez, Mexico is M.V.C.'s "habitual residence." *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) (holding that a removing parent "must not be allowed to abduct a child and then — when brought to court — complain that the child has grown used to the surroundings to which they were abducted.").

2.   "Rights of Custody"

Mexican law governs whether Valenzuela can maintain "rights of custody" over M.V.C.  In this instance, Chihuahua's civil law, including a Mexican judgment

- 10 -

(Doc. 1-4), governs the parties' custody of M.V.C. *Shealy v. Shealy,* 295 F.3d 1117, 1124 (10th Cir. 2002) (remarking that the child's country of habitual residence "governs decisions as to whether custody rights existed at the time of [the wrongful retention]"). The Hague Convention favors a "flexible interpretation" of the rights of custody "because the intention of the [C]onvention is to protect all the ways" a country can define child custody. *Furnes v. Reeves,* 362 F.3d 702, 716 n. 12 (11th Cir. 2004); *Abbott v. Abbott*, 560 U.S. 1 (2010).

Under Mexican law, parents "can agree on the terms of their exercise of parental authority, particularly custody and care of minors." But if the parents disagree, a Mexican judge "will resolve the matter." Chih. Civ. Code, art. 393. Even without physical custody, a parent maintains "the right of coexistence with their descendants." Also, "the personal relationships between the minor and his relatives cannot be prevented without just cause." Chih. Civ. Code, art. 394. If a Mexican judgment establishes a child's residence or awards visitation, a parent cannot unilaterally remove the child to another country. *Abbott*, 560 U.S. at 10-22; *Diaz v. Rios Ibarra*, 2019 WL 4394491, at *5 (D. Ariz. 2019) (describing under Mexican law the *ne exeat* right, that is, the right to consent before a parent can remove a child from the country of habitual residence); *Garcia v. Pinelo*, 125 F. Supp. 3d 794, 807 (N.D. Ill. 2015) (holding that under Mexican law the award of visitation rights necessarily implies that both parents continue to have authority over the child's place of residence), *aff'd,* 808 F.3d 1158 (7th Cir. 2015).

Valenzuela and Cruz's dissolution agreement unequivocally preserves Valenzuela's right to "coexistence" with M.V.C.  The dissolution agreement establishes regular visitation, which Cruz voluntarily extended, in Juarez with M.V.C.  Further, the Mexican Central Authority affirms that Valenzuela's "*patria potestad*" (parental rights), which the dissolution agreement establishes, "can only be modified, suspended, or limited by judicial determination."  (Doc. 53-1)  By unilaterally removing M.V.C. to Florida and by preventing Valenzuela from exercising in Juarez his "coexistence" rights with M.V.C., Cruz violates under Mexican law Valenzuela's "rights of custody" over M.V.C.  *Garcia,* 125 F. Supp. 3d at 807 (finding that a parent cannot "unilaterally render visitation rights meaningless by relocating so far away as to effectively deny the specified visitation rights.").

3.   Exercising "Rights of Custody"

Even if Mexican law vests Valenzuela with "rights of custody" over M.V.C., Valenzuela must have exercised these rights at the time of removal.  *Gonzalez v. Preston*, 107 F. Supp. 3d 1226, 1236 (M.D. Ala. 2015) (Thompson, J.).  A parent can exercise rights of custody in many ways, including by providing financial support or by keeping in regular contact with a child.  *Garcia v. Angarita*, 440 F. Supp. 2d 1364 (S.D. Fla. 2006) (Huck, J.).  Also, a parent can exercise "rights of custody" by initiating a custody action in the country of the child's "habitual residence."  *Moura v. Cunha,* 67 F. Supp. 3d 493 (D. Mass. 2014).  Whether a parent exercises "rights of custody" is a modest standard.  Short of clear and unequivocal abandonment of the

child, a parent cannot easily fail to exercise "rights of custody" under the Hague Convention. *Walker v. Walker*, 701 F.3d 1110 (7th Cir. 2012).

Before M.V.C.'s removal, Valenzuela regularly visited M.V.C. and financially supported M.V.C. After M.V.C.'s removal, Valenzuela promptly began several actions to secure M.V.C.'s return. (Doc. 34-2, Doc. 39) And Valenzuela maintains continued contact with M.V.C. In sum, Valenzuela persistently exercises his "rights of custody" over M.V.C. The Mexican Central Authority counsels that a "unilateral decision" to prevent Valenzuela's exercising his "rights of custody" qualifies as "wrongful [within the] terms of Article 3 of the Hauge Convention." (Doc. 53-1 at 2)

For this reason and because Valenzuela regularly exercises valid "rights of custody" over M.V.C., Valenzuela proves that Cruz "wrongfully removed" M.V.C. from Juarez, Mexico. *Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014); Hague Convention, art. 3

## II. Affirmative Defense

Although Valenzuela proves that Cruz "wrongfully removed" M.V.C., Cruz can retain M.V.C. in Florida by establishing one of several, narrow affirmative defenses. *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1356 (M.D. Fla. 2002) (Steele, J.); 22 U.S.C. § 9001(a)(4). Under Article 13(b), Hague Convention, Cruz argues that M.V.C. cannot return to Mexico because M.V.C. faces a "grave risk" of harm in Juarez.

To succeed under Article 13(b), Cruz "must prove by clear and convincing evidence that 'there is a grave risk that [M.V.C.'s] return would expose [M.V.C.] to physical or psychological harm or otherwise place the child in an intolerable situation.'" *Colon v. Mejia Montufar*, 470 F. Supp. 3d 1280, 1292 (S.D. Fla. 2020) (Moore, J.) (citing Hague Convention, art. 13(b); § 9003(e)(2)(A)). "Grave risk means something more than serious risk." *Taylor v. Taylor*, 2011 WL 13175008, at *8 (S.D. Fla. 2011) (Jordan, J.), *aff'd* 502 F. App'x 854 (11th Cir. 2012); *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016). "The level of risk and danger required to trigger this exception [is] very high." *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013). Cruz argues that M.V.C. faces a "grave risk" of harm in Juarez because Cruz thinks (1) that M.V.C. faces a threat of abduction in Juarez, (2) that Valenzuela's father poses a threat to M.V.C.'s well-being, and (3) that Valenzuela exhibits a history of domestic violence. (Doc. 26 at 13–15)

But at most, Cruz harbors an amorphous and intangible suspicion of danger and fails to establish by clear and convincing evidence that M.V.C. faces a "grave risk" of harm in Juarez. Although attempting to rely on news articles (which were excluded) and State Department reports describing violence in Juarez, Cruz "cannot rely on evidence of general regional violence to establish a grave risk of harm." *Colon*, 470 F. Supp. at 1293. Instead, Cruz must present "evidence of [a] specific risk of harm" to M.V.C, a risk which general regional violence cannot establish. *Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003); *Gomez*, 812 F.3d at 1012.

To establish "a specific risk" to M.V.C., Cruz relies almost exclusively on her testimony recounting telephone calls threatening to abduct M.V.C.  Because a black car "followed" her "once," Cruz suspects an unknown person intends to abduct M.V.C.  But Cruz's failure, among other things, to report the calls to the police leaves only a vague and a remote threat, which cannot support a defense under Article 13(b).  *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011).  Even if true, a few vague telephone calls and an unknown car following Cruz fail to establish by "clear and convincing evidence" that M.V.C. faces a continuing and conclusive threat of abduction.  *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007) (finding that  "isolated and sporadic" threats cannot support the "grave risk" defense); *Colon*, 470 F. Supp. at 1294 (S.D. Fla. 2020).  Cruz offers no direct, corroborating evidence establishing a "specific risk" of abduction to M.V.C.

Cruz's worry about Valenzuela's father similarly fails to establish a "grave risk" of harm.  More than ten years ago, unknown persons accused Valenzuela's father of participating in an abduction scheme.  But no conviction occurred, and the authorities have not again accused Valenzuela's father of violating any law.  The stale and unproven accusations against Valenzuela's father provide no persuasive evidence that M.V.C. faces "grave risk" of harm.  *Fernandez v. Bailey*, 2010 WL 3522134, (E.D. Mo. 2010) (finding that a fourteen-year-old offense "[has] no bearing on the issue of risk"); *Valverde v. Patricia Rivas*, 2008 WL 4185831 (D. Ariz. 2008).

- 15 -

Although spousal abuse "may threaten the well-being of a child," Cruz fails to establish a persistent tendency by Valenzuela toward violence against either Cruz or M.V.C. *Gomez*, 812 F.3d at 1013. After an evening together at a bar, Valenzuela injured Cruz in a fight, but Cruz fails to prove "a clear and long history of spousal abuse," which is important to support a "grave risk" defense.[3] *Walsh v. Walsh*, 221 F.3d 204, 220–21 (1st Cir. 2000) (detailing five years of "violent behavior"); *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008) (detailing repeated physical abuse and threats against mother and child.). Other than her claims about one fight, Cruz alleges only vague and uncorroborated allegations of abuse (not against M.V.C.), which Valenzuela vehemently and credibly denies. And the dissolution agreement's failure to recognize or accommodate a threat to M.V.C. gravitates against her allegations. Instead, Cruz allowed Valenzuela to frequently visit M.V.C. in Juarez after the fight and after the dissolution of their marriage. Further, Cruz maintained social contact with Valenzuela. Again, Cruz's pattern of accommodating behavior toward Valenzuela gravitates against finding that Valenzuela "seriously endangers" M.V.C. *Gil-Leyva v. Leslie*, 780 F. App'x 580 (10th Cir. 2019) (requiring "evidence of clear and long history of spousal abuse" because "isolated incidents of abuse [ ]

---

[3] Cruz shares in Valenzuela's reckless behavior. Cruz not only drunkenly fought Valenzuela in a moving car, but Cruz also brought her children to the bar where she became intoxicated. After fighting Valenzuela, Cruz further endangered her children by calling inebriated friends at the bar for a ride home. Cruz's reckless behavior undermines her credibility and weakens her argument. *German v. Lopez*, 146 F. Supp. 3d 392, 400 n. 22 (D. Mass. 2015) (discrediting a "grave risk" defense because both parents abused each other and their children).

generally demonstrate a risk of harm only to the spouse.").  Cruz falls well short of the evidence needed to "clearly and convincingly" prove that returning M.V.C. to Juarez or to Valenzuela would expose M.V.C. to a "grave risk" of harm.

Even if Cruz could prove that M.V.C. faces a "grave risk" of harm by returning to Juarez, "the court [under Article 18 of the Hague Convention] may exercise discretion to order [M.V.C.'s return] . . . if doing so is in keeping with the Hauge Convention's goals." *Da Silva v. Vieira*, 2020 WL 5652710, at *8 (M.D. Fla. 2020) (Dalton, J.); *Fernandez*, 909 F.3d at 363; Hague Convention, art. 18.  The "two primary objectives" of the Hague Convention are (1) to facilitate the prompt return of "wrongfully removed" children and (2) "to ensure that rights of custody and of access under the law of one [signatory] state are effectively represented in the other [signatory] state."  *Fernandez*, 909 F.3d at 363.

Mexico is the legally preferred forum for adjudicating the parents' respective custody rights.  Although she could have petitioned the Mexican judge to terminate Valenzuela's "coexistence rights," Cruz wrongfully removed (over Valenzuela's objection) M.V.C. from Mexico.  Cruz later began a Mexican action (Doc. 27) to terminate Valenzuela's "coexistence rights," but a Mexican judge has denied (Doc. 49-1) Cruz's request to temporarily allow M.V.C. to reside in Florida during the Mexican action.  By opposing M.V.C.'s return to Mexico, Cruz wrongfully tries to divest Mexico of authority over a custody dispute governed by Mexican law and affecting a child habitually resident in Mexico.  Comity between signatory nations

of the Hague Convention "strongly counsels" trusting, and deferring to, Mexico to resolve justly the custody dispute between Valenzuela and Cruz. *Fernandez*, 909 F.3d at 363; *Hanley v. Roy,* 485 F.3d 641, 644 (11th Cir. 2007) ("The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings.").  For this reason and because Cruz fails to prove "by clear and convincing evidence" that M.V.C. faces a "grave risk" of harm in Juarez, M.V.C. must return expeditiously to Mexico.[4]

## CONCLUSION

Valenzuela's petition (Doc. 1) to return M.V.C. to Mexico is **GRANTED**. Not later than **APRIL 2, 2021**, M.V.C. must return to Juarez, Mexico.  To ensure M.V.C.'s prompt return, not later than **MARCH 31, 2021**, M.V.C. must leave the United States on (the parties have agreed) an American Airlines flight from Tampa, Florida, to Chihuahua, Mexico.  In accord with the parties' agreement, Martin Armando Valenzuela Stirk or Marcela Stirk Chávez or both may accompany M.V.C. on her flight from the United States.  Not later than **APRIL 2, 2021**, Valenzuela must submit a notice confirming M.V.C.'s return to Mexico.

---

[4] After the December 16, 2020 hearing, Valenzuela began (Doc. 34-2) a Mexican criminal complaint against Cruz. Also, Valenzuela allegedly evaded service in Cruz's Mexican custody action. Valenzuela's behavior creates some doubt about Valenzuela's motives in this action. But the Hague Convention constrains this action to the "merits of the abduction claim and not to the merits of the underlying custody battle." *Boehm v. Boehm*, 2011 WL 863066, at *2 (M.D. Fla. 2011) (Whittemore, J.). Whether Valenzuela's seemingly vindictive behavior endangers his custody rights over M.V.C. is a matter for a Mexican judge to decide.

The temporary restraining order (Docs. 6, 20) is lifted only to the extent that M.V.C. may return directly to Mexico as ordered in the preceding paragraph. The clerk is **DIRECTED** to surrender M.V.C.'s travel documents to Martin Armando Valenzuela Stirk or Marcela Stirk Chávez.

This order is not a determination or adjudication of custody rights. Once M.V.C. returns to Mexico, the parties' custody rights are governed by the laws of Mexico, the laws of the State of Chihuahua, and the governing order of the presiding Mexican judge.

Intentional violation of this order can result in a finding of contempt, including the imposition of a fine or confinement or both.

The clerk is **DIRECTED** to enter judgment in favor of Valenzuela and against Cruz, terminate the pending motions, and close the case.

ORDERED in Tampa, Florida, on March 25, 2021.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE